ROSA BALL, Appellee, *vs.* THE EVENING AMERICAN PUB-
LISHING COMPANY, Appellant.

*Opinion filed December 15, 1908—Rehearing denied Feb. 4, 1909.*

1. LIBEL—*correct practice where article does not refer to plain-
tiff by name.* Where the alleged libelous article does not refer to
the plaintiff by name, the correct practice is to allege that the li-
belous words were published of and concerning the plaintiff; and
a plea of the general issue puts this averment in issue, and if the
issue is controverted a question of fact is presented for the jury.

2. SAME—*publication must be interpreted in the sense readers
would understand it.* An alleged libelous publication must be in-
terpreted in the sense in which readers would understand it, and
where the words are ambiguous or equivocal in meaning the ques-
tion of the meaning to be ascribed to them is for the jury, though
the question as to whether or not any particular meaning is libel-
ous is for the court.

3. SAME—*in determining meaning of publication jury may con-
sider surrounding circumstances.* In determining whether alleged
libelous words were published of and concerning plaintiff, where
the published article, which related to the death of a woman, used
a name different from the plaintiff's but used a picture of the plain-
tiff which it stated was a picture of the dead woman, the jury may
take into consideration the facts and circumstances surrounding
the two women, including their names, places of residence, occu-
pations and family connections.

4. SAME—*when motion to direct a verdict on ground of vari-
ance is properly refused.* A motion to direct a verdict for defend-
ant in an action for libel upon the ground of a variance between
the allegations and the proof is properly denied, where the ques-
tion whether such variance exists depends upon the meaning which,
under the evidence, the jury would find would be ascribed to the
published article by the readers thereof.

5. SAME—*when giving instruction authorizing verdict in libel
case is reversible error.* Where the question whether the libelous
words were published of and concerning the plaintiff, as alleged in
the declaration, is in controversy, an instruction directing a ver-
dict for the plaintiff if the jury find the publication is, as to the
plaintiff, untrue, without requiring them to find that such publi-
cation was of and concerning the plaintiff, is ground for reversal.

6. SAME—*what does not, of itself, establish that words were
published of and concerning the plaintiff.* The mere fact that a
libelous article in a newspaper relating to the death of a woman

described in the article as "Pearl Ball" exhibits a likeness of the plaintiff, whose name was Rose Ball, stating such likeness to be "the latest photograph of Miss Ball," does not, of itself, establish the words were published of and concerning the plaintiff.

7. SAME—*when subsequent publications are admissible.* In an action for libel counting upon an article relating to the death of a woman, subsequent publications giving results of later investigations are to be regarded as continuous of the original publication, although none of the articles are identical and each contains different libelous statements of the same general character, and such publications are admissible upon the question of malice, but are not ground for independent recovery if not counted upon.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

This is an appeal by the Evening American Publishing Company from a judgment of the Appellate Court for the First District affirming a judgment for $1500 recovered against it in the circuit court of Cook county by Rose Ball, the appellee, in an action on the case for libel.

The declaration, which was filed on October 4, 1901, after alleging that plaintiff was a person of good name, credit and reputation and deservedly enjoyed the esteem and good opinion of her neighbors before the committing of the grievances complained of, avers that the defendant wickedly and maliciously intending to injure the plaintiff and bring her into public scandal, infamy and disgrace, on or about the 29th day of August, 1901, in Chicago, wickedly and maliciously did compose, print and publish, and caused to be composed, printed and published, of and concerning the plaintiff, a certain false, scandalous, malicious and defamatory libel, the same being in words and figures following:

"Deep mystery now shrouds facts of pretty girl's death.—Persons and scenes connected with mysterious death of Pearl Ball.

237 — 38

"The build and dress of the mysterious man who accompanied Pearl Ball to the Calumet cafe are shown, as described by manager Barry. Below is the route taken by cabman Jordan, who took the girl from the cafe to her home, No. 2 Forty-seventh place, which is shown in black. The house, in black, on Madison avenue, is the home of Dr. Lewis, the Ball family physician. To the left is the latest photograph of Miss Ball. Below is a sketch of the wine-room at the Calumet cafe, where she sat with the mysterious stranger. To the right is the photograph of Miss Jeannette Farrar, friend of Miss Ball, who was with her until nine o'clock the night of her death. Below it is a sketch of cabman Jordan's vehicle, in which Miss Ball was taken home.

"*Death of Miss Ball leads to suspicion.—No clew to identity of the man who was with her.—Statement of two friends.—Miss Jeannette Farrar fears that the girl committed suicide.*

"There are a dozen reasons for the activity of the police in tracing the movements of Miss Pearl Ball, the pretty Hyde Park girl who died from poison yesterday. It is doubtful whether she administered the poison herself or whether it was given to her by another. The key to the mystery is the name of the man with whom the girl sat in a wine-room at the Calumet cafe. While they were in the room there was a scuffle and the girl cried for help. She asserted, when help came, that the man had insulted her. The man was then ejected from the place and the girl sent home in a cab. Inspector Hunt believes that J. C. Barry, manager of the cafe, knows who the mysterious stranger was. He believes that if the man is once caught he can explain why it was that Miss Ball died soon after reaching home when she left the cafe.

"*Story of Dr. Lewis.*—Dr. Denslow Lewis, the family physician of the Ball family, who was an intimate friend of the girl and often took her to places of entertainment,

made a statement to a reporter for the *American* this morning. In it was a significant point. At one o'clock Wednesday morning, he said, 'I was called up by the manager of the Calumet cafe, whom I know, and told that a young woman there, who gave the name of Belle Lewis, had asked to have me called. She had been insulted by the man who was with her, Barry said. I did not go because I thought it was none of my affair. I had not been out with the girl. Instead I gave Barry the address of Miss Ball and told him to have her sent home.' How the young woman happened to give the name of Belle Lewis instead of her own, and how he recognized the name, Dr. Lewis did not explain.

"*Miss Farrar surprised.*—Miss Jeannette Farrar, with whom Miss Ball was until after nine o'clock on the night of her death, said she could not conceive of the reason for such action on the part of her friend.

"*By Dr. Denslow Lewis.*—'Regarding my movements and the possibility of my having been with the unfortunate young woman on the fatal night, I would say that I left my home about seven o'clock and arrived at Randolph street, by way of the Illinois Central, a few minutes later. I then went to the home of Eugene Praeger, 2835 Hermitage avenue, where professional duties occupied my time until late. I reached Randolph street station in time to make the 12:40 A. M. train and arrived home about one o'clock. While preparing for bed the telephone bell rang, and a man named Barry, who said he was manager of the Calumet cafe, told me that a woman giving the name of Belle Lewis wanted me. As she had not been out with me I told Barry to secure a trusty cabman and send the girl home at my expense. I believe he did say a man had insulted her and had been thrown out of the place. Yes, I knew who was meant by Belle Lewis, but can give no further explanation now. I am her family physician, you know, and cannot talk. Miss Ball was of rather pronounced

Bohemian instincts, but I do not believe that her character could be attacked. I can say no more now.'

"*By Miss Jeannette Farrar.*—'On the night of the tragedy Miss Ball visited Ferris Wheel Park, and as I had an engagement to spend the night with a woman friend on the north side, I left her at the car and she said she was going directly home. I cannot imagine who this unknown man is, neither can I say how a girl of such a good character could visit such a place. She might have contemplated suicide and gone to the Calumet cafe to procure drink enough to nerve herself to the deed. Lately she has exhibited symptoms of extreme depression at times, yet perhaps the next day she would sing and be as happy as a lark. To be connected with such a terrible case is dreadful and I am utterly prostrated. If we could only obtain some clew regarding the identity of the man perhaps the mystery would soon be solved. I do not believe she bought a large bottle of morphine, and if a robber murdered her, why did he not take away all her rings? She would never have entered the place with a stranger, and I heard one story to the effect that there were two men and two girls in the party when it entered the cafe. This is all I know about the terrible affair.' "

The declaration then alleges that the defendant, in its said newspaper, repeated the printing and publication of said false, scandalous, malicious and defamatory libel, and so continued to repeat said libel in divers issues of said paper on and during August 30, 1901, amplifying, illustrating and embellishing said libel and printing and publishing the same upon the first or initial page of said newspaper; alleges that at the head of said defamatory article or articles, and as part thereof, in large and conspicuous style and manner, in each of the several editions of said paper, was printed and published the picture or likeness of a woman; that said picture or likeness was ostensibly and by the defendant published as the picture or likeness of the

woman mentioned in said article and named Miss Ball, but plaintiff states that said picture or likeness then and there printed and published by the defendant was not the picture or likeness of the woman mentioned in the said article and named Miss Ball, neither does it in any way resemble or correspond to the likeness or picture of said woman, but that said picture or likeness then and there printed and published by defendant as the likeness of the woman who was said to have committed suicide was and is a true and correct picture or likeness of plaintiff, and that she is not the person mentioned in said article, although her picture appeared in connection therewith and was printed and published as such person and was by the public believed and taken to be such person. The declaration further alleges that said picture or likeness then and there printed and published by the defendant was made from a negative for which the plaintiff was and is the subject; that said picture or likeness was printed and published by the defendant without the knowledge or consent of plaintiff, her family, representatives or agents, and plaintiff says that the public understood and accepted and gave the aforesaid articles the meaning which on their face they conveyed, that is to say, the public understood and believed that the woman whose picture was then and there printed and published by defendant and the woman mentioned in said articles and named Miss Ball were one and the same person, and not otherwise, and that many and divers persons, friends and acquaintances of the plaintiff, both in this and in other States, understood, from seeing and reading said articles, that she, the plaintiff, had committed suicide, and had been and was guilty of drunkenness, lewdness, unchastity and infamous conduct, and had been and was guilty of consorting with low and wicked persons, and had been found in and was accustomed to go into and frequent vile and disreputable resorts, and had done and committed the things and had been a party to and a sharer in the scenes mentioned and

described in said article, by the means of which she has been greatly injured in her good name, etc.

To the declaration defendant interposed the general issue. At the close of all the evidence the court denied defendant's motion for a directed verdict. The motions of defendant for a new trial and in arrest of judgment were overruled. In support of the declaration the court permitted the plaintiff to introduce in evidence, over the objection of the defendant, the copy of the issue of *Hearst's Chicago American* containing the account of the death of Pearl M. Ball as set out in the declaration, and containing, in connection therewith, the picture of the plaintiff, which was designated as Pearl Ball, and the pictures of various persons and scenes described in the article set out in the declaration. Over the defendant's objection copies of later publications of this paper containing further articles relating to the death of Pearl M. Ball were also introduced in evidence.

It is urged by appellant that the Appellate Court should have reversed the judgment of the circuit court.

DARROW, MASTERS & WILSON, (EDGAR L. MASTERS, of counsel,) for appellant.

SIMMONS, MITCHELL & IRVING, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The refusal of the court to direct a verdict for the defendant at the close of all the evidence is assigned as error. It was contended in support of that motion that the article was not libelous. Without entering at length into a discussion thereof, we are satisfied that if the publication set out in the *narr.* was published of and concerning the plaintiff an action lies for libel. It is also urged that the motion should have been allowed because there was a variance between the proof and the declaration, in this: that the declaration averred that the article in question was pub-

lished of and concerning the plaintiff, while the proof shows, without contradiction, that it was not so published, but was published of and concerning a person other than the plaintiff. It is to be observed that the declaration charges not only that the picture or likeness published as that of Pearl M. Ball was, in fact, that of the plaintiff, but also that the printed words were published of and concerning the plaintiff. In considering the question of the alleged variance it seems appropriate also to consider a question raised as to the propriety of an instruction given on the part of the plaintiff, the determination of the questions turning somewhat upon the same matters. The instruction so referred to was No. 4 given at the request of the plaintiff, and is in the words following:

"The court instructs the jury, as a matter of law, that if you find, from a consideration of the evidence and the law as stated in these instructions, the publication in question is as to the plaintiff untrue and was made by the defendant, it is libelous, and the plaintiff is entitled to such damages as shall afford a reparation for all the injury, including mental suffering and humiliation, which has naturally and approximately resulted from the publication, if any, shown by the evidence."

It is to be observed that this instruction omits the element that the alleged libelous words were published of and concerning the plaintiff, and it is in this respect that the instruction is criticised. The plea of the general issue alone was filed. There was no contention that the words were true as to the plaintiff, and the instruction, standing alone, was an instruction to find for the plaintiff, because it advised the jury that the publication was libelous and eliminated the only other defense relied upon, viz., that the words were not spoken of and concerning the plaintiff. Where the words published or spoken do not refer to the plaintiff by name, the proper practice is, as was done here, to aver that they were spoken of and concerning the plain-

tiff, and the plea here filed put this averment in issue. It is elementary that an alleged libelous publication must be interpreted in the sense in which readers would understand it, and in this State it has been held in slander suits that the testimony of the hearers as to the sense in which they understood the words spoken is admissible. (*Nelson* v. *Borchenius,* 52 Ill. 236.) This rule applies to a statement of the witness to the effect that he understood the alleged slanderous words were spoken with reference to the plaintiff, where the plaintiff's name was not used. (*Dexter* v. *Harrison,* 146 Ill. 169.) Where the words are ambiguous or equivocal in meaning, the question of the meaning to be ascribed to them is for the jury, although the question as to whether or not any particular meaning is libelous is, of course, for the court. Where, as here, there is a controversy as to whether or not the words were published of and concerning the plaintiff, the question whether they were so spoken is for the jury. In each of the cases of *VanVechten* v. *Hopkins,* 5 Johns. 211, *Miller* v. *Butler,* 6 Cush. 71, *Goodrich* v. *Davis,* 11 Metc. 473, *Prosser* v. *Callis,* 117 Ind. 105, *Stoken* v. *Morning Journal Ass.* 73 N. Y. Supp. 245, and *Palmer* v. *Bennett,* 31 id. 567, the words complained of did not name the plaintiff, and it was held that the question whether they were of and concerning the plaintiff was one of fact to be determined by the jury. The defendant contends that the law is so, and the plaintiff, in effect, agrees, as she states by her brief that the "rule for interpretation of an alleged libel is what the world would generally understand it to mean," and "whether the article was published of and concerning the plaintiff is a question for the jury."

Plaintiff contends that the case is to be regarded as one where the defendant published libelous words of and concerning a woman, and then, exhibiting a likeness of the plaintiff, states, in effect, "this is the picture of the woman of whom the words are published;" while, on the other

hand, the position of the defendant is, that, so far as the printed words are concerned, the entire article applied only to Pearl M. Ball, as appears from a reading thereof, and that there is no evidence which indicates that any part of the publication was of and concerning the plaintiff. We do not regard either position as tenable. A little reflection will show that it does not necessarily follow from the publication of the picture that the words in the article had reference to the plaintiff. If, for example, a newspaper should publish a statement to the effect that a female child (naming her) had died of cholera infantum and that her picture appeared at the foot of the article, while at the place indicated there appeared a likeness, not of a child but of a bearded and aged man, with the name of the babe printed thereunder, it would be at once evident, whatever the rights of the subject of that picture were, that the words in reference to the death, and the cause thereof, were not spoken of and concerning him. As stated above, the publication must be given the same meaning that would be attached thereto by the readers, and in determining what that meaning was, it was proper for the jury to take into consideration the facts and circumstances surrounding these two women and the facts and circumstances attendant upon the death of Pearl M. Ball. There is no pretense that the printed words were untrue in reference to Pearl M. Ball, other than the statement that the picture published was her likeness, and excluding the picture there is no contention that anything was said in print of and concerning Rose Ball, the plaintiff, so that no application of the article to Rose Ball would be apparent to any person reading it, except such persons as would be able, by their acquaintance with her or knowledge of her, to recognize the picture published as her likeness.

The plaintiff lived at or near Charlotte, Iowa, until she came to Chicago, in 1893, when she was about eighteen years of age. Her family still resided in Iowa in 1901 and

seem to have been people in very moderate circumstances. Prior to coming to Chicago she had studied stenography. A young lady, also a resident of Iowa, came with her. The two resided for a time with a married lady with whom they were acquainted before they came, and later lived in a rooming house or boarding house until the young lady who accompanied the plaintiff married a man by the name of Rowe. After that, for a time the plaintiff lived with this couple. For about two years after coming to the city she seems to have been employed only occasionally, but after that she was usually employed as a stenographer. According to her testimony her circle of acquaintances in Chicago was not an extensive one. About three years after she came to Chicago she left the Rowes and thereafter lived in various boarding houses. During the last five years she was in Chicago she was in the employ of a publisher and did regular stenographic work in his office. In December, 1900, she returned to her home in Iowa, where she remained for a month or so, and after that went to Helena, Montana, upon the suggestion of the Rowes, who then resided at that place. She was there employed in a dry goods store until the latter part of September, 1901. During the time she was in Chicago she had several photographs made at a studio owned and conducted by a man by the name of Godfrey.

Pearl M. Ball, an unmarried woman, died suddenly in Chicago at her father's home, where she lived, on the evening of August 28, 1901. On the next morning, newspaper reporters, representing the defendant's paper, *The Chicago Record-Herald, The Chicago Tribune* and *The Chicago Chronicle,* all newspapers published in Chicago, called at the residence of the father to ascertain the facts in connection with the death of his daughter. The representatives of the four papers named were there at the same time, and asked, among other things, whether the father would let them take a picture of the daughter for publication. The

father told them that Godfrey had made photographs of his daughter and had the negatives, and that he (the father) would not object if Godfrey saw fit to give them a picture. At least two of the reporters went to Godfrey's, and sooner or later all obtained from him copies of a picture of the plaintiff although they were seeking a picture of Pearl M. Ball. Godfrey kept a register and an index of his negatives, and in examining the list for the purpose of locating the negative of Pearl M. Ball he overlooked her name upon his records, although it was there, and stated to the only reporter who was then present, in substance, that he had no negative of Pearl M. Ball but that he had a negative of Rose Ball. The evidence tends to show that this reporter then stated to him that Rose Ball and Pearl M. Ball were one and the same; that Pearl M. Ball sometimes went by the name of Rose Ball and that he would recognize the negative of Pearl M. Ball. Godfrey then exhibited the negative of Rose Ball and the reporter stated that it was the negative of Pearl M. Ball. Just exactly what occurred there at the studio is somewhat in doubt, owing to the fact that neither Godfrey nor any of the reporters who talked with him testified. It is certain, however, that Godfrey, following the conversation just detailed, printed photographs from the negative of Rose Ball and furnished each of the newspapers named above with a copy. Each of the newspapers published an account of the death of Pearl M. Ball, and with it, as a picture of Pearl M. Ball, published the likeness of the plaintiff. Copies of some of these publications were sent to Rose Ball at Helena, Montana, where she was then living, by a friend in Chicago, and during the month of September, 1901, she returned to Chicago and shortly thereafter instituted several suits on account of these publications. Pearl M. Ball had lived in Chicago all her life and at the time of her death was twenty-four years of age. She was widely known in musical circles. She was an accomplished pianist and was a composer. Her father

was Charles H. Ball, and she lived with him at his home at No. 2 in Forty-seventh place. He had been engaged in the piano business for a number of years in the Auditorium building.

In determining what meaning would be put upon the publication by the readers thereof in order to decide whether the words printed were printed of and concerning the plaintiff, as against the fact, on the one side, that plaintiff's picture was published as that of Pearl M. Ball in connection with the article, it was the duty of the jury to consider, on the other side, the fact that the person named in the article was Pearl M. Ball; that Rose Ball then lived at Helena, Montana; that the subject of the article, as therein stated, lived in Forty-seventh place, Chicago; that the plaintiff was a stenographer, and the dead woman, as appeared from the publication, was a pianist and composer of music; that the plaintiff's family had never resided in Chicago; that the family of the dead woman, as stated by the article, resided in Chicago and her father was engaged in business there; that the family of the dead woman had a family physician in Chicago, according to the article; that the family of the plaintiff never resided in Chicago and in the usual course of events would not have had a family physician there.

We conclude, therefore, that the question whether there was a variance depends upon the meaning which, under the evidence, the jury would find would be ascribed to the publication by the readers thereof, and that for this reason the motion for a peremptory instruction could not be allowed upon the ground of the existence of a variance. We are also of the opinion that the question whether the article was published of or concerning the plaintiff was improperly eliminated from the instruction which is above set out.

It is contended by plaintiff, however, that the instructions, as a whole, state the law correctly, and that the missing element in this instruction is supplied by plaintiff's given instruction No. 2. That rule does not obtain where, as here,

the erroneous instruction directs a verdict upon proof of certain facts.   Moreover, we find, upon examination, that the plaintiff's instruction No. 2 does not supply the missing element.   That instruction merely required the jury to find "that the defendant published the portrait of the plaintiff, Rose Ball, in connection with the story of Pearl Ball, as charged in the declaration."   The instruction contains no requirement in reference to finding that the written part of the publication was of and concerning the plaintiff.   On the other hand, the court refused instruction No. 4 asked by the defendant, which correctly stated the law in this regard.

Plaintiff then states that the third instruction asked by the defendant assumed that the publication was made of and concerning the plaintiff, and that the question whether it was so made has by that assumption been eliminated from the realm of contest.   We find that this instruction contains no assumption whatever that can be regarded as applying to the words of the publication.   The alleged assumption pointed out is only in regard to the portrait.

It is also contended by plaintiff that the mere publication of the picture of another without the consent of that person is a violation of the right of privacy; that plaintiff was entitled to recover in this case irrespective of the publication of any words.   Whether this be a correct statement of the law is immaterial.   The declaration does not seek to recover for a violation of the right of privacy.   The declaration sought, and the instructions permitted, the recovery of damages for the words printed as well as for the publication of the likeness.   The motion for a directed verdict was properly refused.   The giving of the instruction above set out was reversible error.

There is no evidence whatever in the record indicating that Pearl M. Ball was ever known or called by the name of Rose Ball, and there is no competent evidence in the record indicating which newspaper the reporter represented who made statements to Godfrey to that effect.   Nor is there in

the record any evidence that Rose Ball was ever known by any name other than her own.

The publication for which the suit was brought was made in an evening edition of the newspaper published on August 29, 1901. For the purpose of proving repetitions of the libel, the plaintiff, over the objection of the defendant, was permitted to introduce in evidence three articles published in editions of the paper subsequent to that in which the article counted upon appeared. One of these subsequent publications was in a late edition published on August 29, 1901, and the other two were published on the next day. The publication made in the later edition on August 29 was identical with the one counted upon and was properly admitted in evidence as a repetition. As to the articles published on the 30th, however, while each was accompanied by the likeness of the plaintiff purporting to be a picture of Pearl M. Ball, both were materially different and neither could be regarded as identical with the articles published on the 29th. Both give the results of later investigations made for the purpose of ascertaining the cause of the death of Pearl M. Ball, and both contained statements, not contained in the articles of the 29th, which, if made of and concerning the plaintiff, would in the light of the testimony in this record be libelous. A material alteration makes a different libel, for which a suit may be maintained or upon which a count may be joined.

Defendant insists that the alleged libelous statements found in the articles of the 30th which were not in the article counted upon render the publications of the 30th inadmissible. Whether subsequent publications of independent libels differing in character from the first, not connected therewith and not counted upon, may be proven for the purpose of showing malice of the defendant, is a question in reference to which the authorities are in conflict. It has never been passed upon by this court. The defendant, in this connection, relies principally upon the case of *Root* v.

*Lowndes,* 6 Hill. 518. Plaintiff says that case has been repudiated and discredited by a discussion found in Wigmore on Evidence. The judgment in that cause was the pronouncement of able judges. To their professional knowledge, theoretical in character, had been added wisdom acquired by long experience in the actual practice and administration of the law in the courts. We do not regard the force of that adjudication as an authority as at all weakened by Prof. Wigmore's unfavorable criticism of the court's views.

We are of opinion, however, that the publications of the 30th cannot be regarded in this case as independent of the publication counted upon. On the contrary, they were connected therewith. They are like unto the later installments of a serial story. They form a continuation of the relation of the alleged facts relative to the death of Pearl M. Ball, and of the circumstances surrounding that event, as those facts and circumstances had been ascertained to exist after the first publication, and they carry the recitation down to the time of her funeral. Being so connected with the original publication and bearing upon the same matter as that publication, they were by the great weight of authority admissible in evidence as tending to show malice on the part of the defendant. The cases on the subject are collated at pages 496 and 497 of 25 Cyc. Whether the later publications would be admissible if they charged a libel wholly independent of, having no connection with and differing in character from the original publication is not here to be decided. The publications of the 30th, however, could not, upon the declaration filed in this case, be made the basis, in and of themselves, of a verdict for the plaintiff.

With the proof in this condition the court gave to the jury the first instruction requested by the plaintiff, which reads as follows:

"The court instructs the jury that any publication the necessary tendency of which is to expose a person to the

hatred, contempt or ridicule of his or her fellow-men is a libel, and if you find, from the evidence, that defendant, as charged in the declaration in this case, published anything the necessary tendency of which was to expose the plaintiff to hatred, contempt or ridicule, you will find the issues for the plaintiff."

The instruction is somewhat awkwardly drawn. It is to be perceived, however, that it permits a recovery for the publication of any libel of the plaintiff by the defendant which was charged in the declaration. No publication except the original one was counted upon, but the declaration charges that the defendant repeated the publications of the libelous article in subsequent issues of the paper, "amplifying, illustrating and embellishing said libel." We think the jury would consider the subsequent publications as having been charged by the declaration, and that the instruction just set out was erroneous because it would be regarded by the jury as authorizing them to return a verdict in favor of the plaintiff upon the theory that the later publications were libelous, even if they did not regard the defendant as having been guilty of libel in making the publication counted upon. Instructions in reference to which an analogous question arose have heretofore been held by this court to be erroneous. *Chicago and Alton Railroad Co.* v. *Rayburn,* 153 Ill. 290; *Ratner* v. *Chicago City Railway Co.* 233 id. 169; *Hackett* v. *Chicago City Railway Co.* 235 id. 116.

In his final argument to the jury counsel for the plaintiff made a statement in reference to what occurred in the Appellate Court in the trial of the case brought by the plaintiff against the Tribune Company. The court sustained the objection and said that the statement was one which the jury should not consider. Defendant insists this did not cure the error. The statement was improper. Counsel for plaintiff will no doubt refrain from making it upon another trial.

The plaintiff having sought damages by a declaration which states a good cause of action for alleged libelous printed words which, standing alone, apparently concerned the life and death of Pearl M. Ball, and having asked instructions (which were given) directing the jury, in the broadest terms, to return a verdict in her favor if they found that said printed words were untrue as to the plaintiff, now insists that the publication of the picture, in connection with the article, as the picture of Pearl M. Ball was libelous, and that such publication of the likeness not being denied and being clearly proven the judgment should not be disturbed.   Had the declaration been framed averring that the printed account of the death of Pearl M. Ball, setting it out literally or stating its substance, was published by the defendant, and that in connection with that article defendant published the portrait of the plaintiff as the likeness of Pearl M. Ball, and containing further apt language necessary to charge libel in publishing the picture in connection with the article, and not charging that the publication of the words in and of itself constituted a libel, a very different case would be presented from that now before us. The course just suggested was not pursued, but instead the plaintiff charged, and was permitted to recover on the theory, that all of the printed words contained in the article were of and concerning her.   It follows that we cannot, under the declaration filed, affirm the present judgment merely because it is clearly proven, and not denied, that the picture is that of the plaintiff.

Alleged errors not above referred to have been discussed.   We deem it unnecessary to consider them.

The judgment of the Appellate Court and the judgment of the circuit court will be reversed and the cause will be remanded to the latter court for further proceedings consistent with the views hereinabove expressed.

*Reversed and remanded.*