## ASHFORD v. EVENING STAR NEWSPAPER COMPANY.

## MOONEY v. EVENING STAR NEWSPAPER COMPANY.

## WEBSTER v. EVENING STAR NEWSPAPER COMPANY.

LIBEL AND SLANDER; PLEADING; PRIVILEGE; PUBLIC OFFICERS; NEWS-
PAPERS; MALICE; PRINCIPAL AND AGENT; EVIDENCE.

1. The defense of privilege in an action for libel is available under the plea of not guilty. (Citing *Brice* v. *Curtis*, 38 App. D. C. 304, 38 L.R.A. (N.S.) 69, Ann. Cas. 1913C, 1070.)

2. An issue of justification in an action for libel, joined on a plea which is limited to the truth of the words according to their natural sense, is likewise limited, and does not extend to the meaning imputed to them in the innuendoes.

3. The doctrine of privilege in the law of libel permits an honest censorship, by the newspaper press, over the conduct of officials in the management and control of public affairs.

4. If a person in the performance of a duty imposed is required to speak or make publication, the privilege is absolute, irrespective of the question of malice, even though the utterances may be false, malicious, and injurious; but where the duty or obligation is optional, and rests only upon a moral or social obligation, the privilege is conditional or qualified, and exists only when the comment is based on

facts substantially true, and when made with proper motives re-
butting any legal presumption of malice. The latter privilege affords
protection until actual malice is shown, and the burden of proving
malice is upon the party asserting it.

5. A newspaper article calling attention to the misconduct of a public offi-
cer in the administration of public affairs is qualifiedly privileged.

6. The qualified privilege which attaches to the criticism of official mis-
conduct does not extend to the facts upon which the criticism is predi-
cated, since there is no privilege to falsify such facts.

7. A publication stating that no record of the cancelation, by the building
inspector for the District of Columbia and his assistant, of certain
items in a contract for public improvement, was kept "on file in the
case," is technically correct for the purposes of bringing the publica-
tion within the rule of qualified privilege, where, although the as-
sistant filed a card showing the canceled items in the inspector's
office, there was a noncompliance with the law requiring a memo-
randum of the changes to appear in the minutes of the proceeding
in the commissioners' office and in the contract itself.

8. To render a privileged communication actionable, express malice, or
malice in fact, must be shown. This may appear from the face of
the publication, or from extrinsic proof.

9. No inference of express malice will be drawn from a publication unless
it is so excessive, intemperate, unreasonable, and abusive as to forbid
any other reasonable conclusion.

10. Malice on the part of a newspaper corporation in the publication of an
alleged libelous article cannot be shown by statements made several
months after the publication, by a director of the corporation who
was also news manager for the paper under the supervision of the
editor, but who was absent at the time of the publication of the ar-
ticle, and who would not have been charged with the duty of super-
vising the same if present. (Citing *Hayzel* v. *Columbia R. Co.* 19
App. D. C. 359.)

11. A written statement prepared by the plaintiff in an action for libel,
and claimed to detail a conversation with a person connected with
the defendant, is not admissible to show malice, where the plaintiff
testifies at the trial, and there is nothing to show that he does not
have a distinct recollection of the conversation. (Citing *Sechrist* v.
*Atkinson*, 31 App. D. C. 1; *Gurley* v. *MacLennan*, 17 App. D. C. 170;
and *Crawford* v. *United States*, 30 App. D. C. 1.)

12. Other articles published by a newspaper in relation to the official con-
duct of a public officer are inadmissible to show malice, in his action
against the paper for the publication of an article charging him with
misconduct in connection with a contract for public improvements,

where they do not relate directly to his conduct in connection with the particular contract.

Nos. 2504, 2505, 2506.  Submitted October 13, 1913.  Decided February 2, 1914.

HEARING on an appeal by the plaintiffs from judgments of the Supreme Court of the District of Columbia upon a verdict directed by the court in consolidated actions for libel.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

These are actions for libel, and are here on bill of exceptions from judgments upon a directed verdict for defendant, the Evening Star Newspaper Company, at the conclusion of plaintiffs' testimony.  The cases were consolidated for trial.

The alleged libel consists of the following article published in a Washington newspaper, the Evening Star:

Stevens Makes Charges.
Ex-Superintendent of Bathing Beach Talks.
Says He Has Been Deprived of Part of His Salary—Criticism
of Officials.

Mr. W. X. Stevens, who recently resigned as superintendent of the local bathing beach, yesterday made the following statement to a reporter of the Star:

"The last paragraph of my letter of resignation as superintendent of the bathing beach reads: 'But the direct cause of my resignation is the peculiar management by the District office of inspector of buildings, whereby, in my opinion, a considerable sum of money which was appropriated for the use of the bathing beach has been wasted.'

"The style of management to which I object comprises four counts:

"1. The contract drawn up by the building inspector's office for the favored bidder does not cover anywhere near all the work that was called for at the bidding.

"2. When asked by the commissioners to see if some portion of the proposed expense could be avoided, Condemning Inspector Webster reported as follows: 'I have carefully gone over the conditions with the present needs, and find that it would not be advantageous to the department to eliminate any portion of the proposed work.' And yet, after thus fixing the price, they did eliminate a large portion of the proposed work.

"3. By a peculiar private agreement between the contractor and Mr. Webster, a great deal of the work specified in the contract was left undone.

"4. The work as accepted, and as it now shows, is disgracefully shabby.

## "Alleged Plan of Operation.

"By invitation, a few contractors met at the beach, heard a verbal statement made by Mr. Webster of what was required, and three of them—whom we will call A, B, and M—put in bids. The bids of A and B enumerate what was to be done, and are high. The bid of M covers the same general field, but is loosely worded, yet it was a very close hit at the sum total available for this purpose, but it was a little above that amount, and the records show that on the next day following his bid, M made an offer to reduce it by $100 if the linings of the pools were left out. So his bid stands at $1,645.

"Many days passed, and nothing was done. It is fully decided that concreting the lake bottoms is the only means of preventing the growth of water weeds. As there are no data to be had about concreting on soft mud, I was very anxious to try an experiment, so that we could inform the present Congress exactly what can be done and at what cost; so I wanted to save enough money of the present appropriation to concrete the little pools within the building.

"As I could not put in a bid in my own name, I carried the offer of a contractor to do all that had been asked for, and, in addition, to put up lattice to inclose under the sides of the building, for $1,300. As this would save the District $500 and ac-

complish our great object, I supposed the inspector of buildings would favor the offer in every possible way.    On the contrary, he became very angry, used abusive language, and said the contract with M was already closed, and no further bids could be entertained.    But, as a fact, the contract was not closed nor the agreement as to prices settled, until several weeks later —so long that Mr. Ashford—as he told the Commissioners in my hearing—suggested to M that he go to the beach, and see if he would still stick to his bid, or whether there was deterioration to prevent.

### "Deterioration Reported.

"It does not appear that M had intimated any dissatisfaction with his bid, but, thus invited, he reported deterioration to the amount of $150.    There was no one present representing the beach or the District to require the deterioration to be pointed out, but Mr. Ashford allowed the claim for it.    Here let me state that I was in charge of that building, and as I was to back up the $1,300 offer I examined every part carefully, and noted that it held its own perfectly.    There was no deterioration to increase the cost of repairs by one dollar.

"As there was no more money available, that $150 was allowed by Mr. Ashford, leaving out at his discretion enough work to cover it; and I think he surely did leave out $150 worth of work.

"The contract was not signed by the commissioners until after the work was all done, and it does not contain a word of reference to any item left out.    To explain this, Mr. Ashford described a convenient and pliable method of executing contracts.    He states that his assistant, Mr. Webster, and the contractor, M, got together and agreed on the details to be left out to cover the $150 deterioration claim, and Mr. Webster said that minutes were kept of that agreement; and yet, when the work had been done and paid for, no such minutes had ever been of record or on file in the case.

"The bill of M was submitted for my approval.    I returned

that bill January 18, 1908, not approved, and I gave an itemized statement showing wherein the contract had not been complied with. However, it was paid without my approval. The District owes me $65.85 due last July, as admitted by the auditor, but refuses to pay me on the ground that I ought to have watched the condition of the appropriation, and have saved enough to pay myself, instead of using it for the beach. I quote from my letter of March 4, 1908, to Commissioner West, in reply to that refusal:

" 'The District would have saved at least $645 by accepting my offer (the $1,300 offer), and there cannot be found a piece of work done by me at the beach as poor as a great deal of the work accepted of M on this job. I therefore insist that I am not to blame for the shortage in the construction fund, and that my bill of $65.85 should be paid in full.'

"Investigation Follows:

"This caused an investigation at the beach. Many of the concrete foundation stones are not of the size required, and none that was uncovered stands centrally under the posts. Two of the five uncovered in the drying yard are so far to one side that the posts project more than half their bases beyond the face of the stones. One stone that shows on top of the ground to be two feet square proved to be only nine inches deep and a mere collar around the post, when it should be thirty inches deep under the post.

"The contract demands that the floors shall slant toward the pools to drain the water off, but they slant the other way,—a very serious objection, as every shower of rain tends to rot the structure.

"The high partition should have had large posts running into the ground. The posts set up are small and fastened on top of the floor by nails toed in, and the partition can be swung to and fro by hand. The contract calls for thirty-two concrete bases under the pool steps, yet not one has been so done. A stake

driven into the mud takes the place of the eighteen inches square by thirty inches deep stones called for.

"The contract calls for cornices to be built across the ends of the building, amounting to 375 area feet, which has not been done at all.  In relation to work shabbily done, Mr. Ashford makes scientific explanation showing it to be impracticable; and yet the contract required it and the contractor engaged to do it.  The only difficulty that I see to doing all that work well is that it would lessen the profits.  As to the published statement that my statements are not well founded, let me say that the conditions still exist at the beach, as I will be pleased to show to any public spirited person."

It was stipulated that the article was written by William X. Stevens, and taken by him to Theodore Noyes, editor of the Evening Star, a newspaper published and owned by the defendant company, and that defendant, acting by and through its editor, accepted and published the article in the Sunday Star, March 22, 1908.  During the times referred to in the article, plaintiff Snowden Ashford was inspector of buildings for the District of Columbia; plaintiff William L. Webster was assistant inspector of buildings, and plaintiff William E. Mooney was a public contractor engaged in constructing a public building for the District.

The declarations of the respective plaintiffs are in the usual form.  The article is set out with innuendoes deduced therefrom.  They also charge defendant with malice in the publication of the article.  Defendant answered in each instance "not guilty," and for a further plea answered "that the words in the said declaration and in the several counts thereof declared upon and set forth are true in substance and in fact according to the natural and ordinary signification, and without the meaning imputed to them in the several innuendoes contained in the said declaration and in the several counts thereof."  Issue was joined upon the pleas.

*Mr. Henry E. Davis, Mr. C. Clinton James,* and *Mr. E. B. Slater* for the appellants.

*Mr. R. Ross Perry, Mr. R. Ross Perry, Jr.;* and *Mr. Frank J. Hogan* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court.

It was proper for the court below to permit defendant to avail itself of the defense of privilege under the plea of not guilty. *Lillie* v. *Price,* 5 Ad. & El. 645, 1 Nev. & P. 16, 5 Dowl. P. C. 432, 2 H. & W. 381, 6 L. J. K. B. N. S. 7; *O'Brien* v. *Clement,* 15 Mees. & W. 435, 2 Dowl. & L. 676, 15 L. J. Exch. N. S. 285; *McBee* v. *Fulton,* 47 Md. 403, 28 Am. Rep. 465; *Bradley* v. *Heath,* 12 Pick. 163, 22 Am. Dec. 418. In *Brice* v. *Curtis,* 38 App. D. C. 304, 38 L.R.A.(N.S.) 69, Ann. Cas. 1913C, 1070, this court approved the action of the lower court in directing a verdict for defendant on the question of privilege raised under a plea of general issue. The plea of justification interposed by defendant was limited to the truth of the words published according to the natural and ordinary signification, and without the meaning imputed to them in the several innuendoes contained in the declaration. Issue was joined on this plea. Defendant might have justified the libel with its innuendoes as laid in the declaration, as is frequently done, but it was not so pleaded here. Hence the issue of justification is limited to the truth of the words used in their ordinary sense, without the meaning imputed to them in the innuendoes.

The motion for a directed verdict was based upon the grounds that the publication is privileged, and that plaintiffs' evidence established the truth of the publication sufficiently to sustain the plea of justification. The publication is not libelous *per se.* This brings us at once to the question of privilege. One of the highest duties imposed upon the press is that of conducting an honest censorship over the conduct of officials in relation to the management and control of public affairs. Whether or not the officers of the government are dispensing the public revenues in conformity with law, and are conducting themselves according to customs and rules established to regulate their official conduct, are matters of the highest concern to every citizen.

It should not, therefore, be the policy of the courts to curb reasonable and proper comment when based upon a true statement of fact.

This privilege, which the law recognizes, originates in the right, obligation, or duty to speak or make publication in respect of some matter under consideration. It may be imperative or optional. If a person in the performance of a duty imposed is required to speak or make publication, the privilege is absolute, irrespective of the question of malice, even though the utterances may be false, malicious, and injurious. For example, this absolute privilege extends to the judges of courts of general jurisdiction, and to the heads of executive departments of the government. *Bradley* v. *Fisher,* 13 Wall. 335, 20 L. ed. 646; *Spalding* v. *Vilas,* 161 U. S. 483, 40 L. ed. 780, 16 Sup. Ct. Rep. 631. But a different rule applies where the duty or obligation is optional and rests only upon a moral or social obligation. In that instance, the privilege is conditional or qualified, and exists only when the comment is based upon facts substantially true, and when made with proper motives rebutting any legal presumption of malice. The privilege then affords protection until actual malice is shown, and the burden of proving malice must be assumed by the party asserting it.

The occasion in modern experience which calls most frequently for the application of the doctrine of qualified privilege is where a newspaper calls attention to the misconduct of a public officer in the administration of public affairs. In all such instances the newspaper may remain silent; but if it elects to speak, its words are privileged, if it is prompted by an honest desire to present to public scrutiny the transactions of the official in the discharge of his trust. The rule is announced in *Kelly* v. *Sherlock,* L. R. 1 Q. B. 686, as follows: "And provided a man, whether in a newspaper or not, publishes a comment on a matter of public interest, fair in tone and temperate, although he may express opinions that you may not agree with, that is not a subject for an action for libel; because whoever fills a public position renders himself—again happily—open to public discussion, and if any part of his public acts is wrong, he

must accept the attack as a necessary though unpleasant circumstance attaching to his position. In this country, everything, either by speech or writing, may be discussed for the benefit of the public." The principle is declared to be "a universal one, that the public convenience is to be preferred to private interests, and that communications which the interests of society require to be unfettered may freely be made by persons acting honestly, without actual malice, notwithstanding that they involve relevant comments condemnatory of individuals." *Henwood* v. *Harrison,* L. R. 7 C. P. 606. The same rule is announced in *Gott* v. *Pulsifer,* 122 Mass. 235, 23 Am. Rep. 322; *Gandia* v. *Pettingill,* 222 U. S. 452, 56 L. ed. 267, 32 Sup. Ct. Rep. 127.

The privilege does not extend to the facts upon which the criticism or comment is predicated, for there is no privilege to falsify the fact upon which the communication to which the privilege extends is based. In *Burt* v. *Advertiser Newspaper Co.* 154 Mass. 238, 13 L.R.A. 97, 28 N. E. 1, the court, holding that false statements of fact are not privileged, said: "The articles published by the defendant, so far as they contained false statements, were not privileged. We should add, however, with reference to another trial, that there was evidence that some of the charges in the articles were true, and so far as the jury might find them to be so, inasmuch as the matter under discussion was a matter of public concern, the defendant would be justified not only in making those charges, but in free and open comment and criticism in regard to them."

In the present case the framework of fact upon which the alleged libelous comments are made is conceded to be true. It is the truth of fact that hurts. The admitted facts reflect more discredit than the comments. The entire transaction to which the article complained of relates was conducted, in many particulars, in total disregard of the requirements of the law and the regulations of the inspector's office. Every material statement of fact contained in the publication, but one, is admitted. by plaintiffs to be true. That one is so closely allied to facts admitted as to easily lead the writer into a mistaken statement.

This statement is to the effect that no record of the items called
for in the contract which Webster and Mooney omitted in order
to make up for the $150 deterioration is "on file in the case."
A card showing the items was produced at the trial, and shown
to have been prepared by Webster and filed away in Ashford's
office. If the contract had been let as required by law, a memo-
randum of those changes would have appeared not only in the
minutes of the proceeding in the commissioners' office, but in
the contract itself, where it should have been. The changes
were agreed upon by Webster and Mooney, and no proper pub-
lic record made of them. The statement that "no such minutes
had ever been of record or on file in the case" is technically cor-
rect, since the card produced is not such a public record as the
law requires to be kept in connection with the execution of
public contracts. Thus, the whole framework of fact upon
which the article was constructed was admitted to be substan-
tially true,—sufficiently so, in the absence of malice, to bring
the publication well within the rule of qualified privilege.

This brings us to the proof of malice. The communication
being privileged, defendant will be presumed to have been
actuated by pure motives in its publication. In order to rebut
this presumption, express malice or malice in fact must be
shown. This may appear from the face of the publication or
from extrinsic proof. We are of opinion that the article con-
tains nothing from which actual malice can reasonably be in-
ferred. This is so clear that there seems to us to be no room
left for reasonable minds to differ upon this point. Before the
inference of express malice can be indulged, the publication
must, in comment, be so excessive, intemperate, unreasonable,
and abusive as to forbid any other reasonable conclusion than
that defendant was actuated by express malice. Nothing ap-
pears on the face of the publication in this case to justify such
an inference.

Offers were made by plaintiffs to prove malice by extrinsic
evidence. They sought to put in evidence a written statement
prepared by plaintiff Ashford (purporting a detail to conver-
sation between him and Thomas C. Noyes, a stockholder and

director in defendant corporation. It also appears that, short-
ly after the publication of the alleged libel, Noyes was made
treasurer of the corporation. He was also in the employ of
the newspaper, under the designation of news manager, a sal-
aried position under the direct supervision of the editor. On
objection of defendant the court refused to admit this state-
ment. The statement was properly excluded for several reasons.
The conversation occurred some months after the publication of
the alleged libelous article, and after the declarations in these
cases were filed, and consisted of threats made by Noyes against
plaintiff Ashford because of the institution of the present suits.
It appears in the course of the trial that Thomas C. Noyes, at
the time the article was published, was absent from the city
and knew nothing of it, and that, had he been present, it would
have been no part of his duty to supervise its publication. The
court was considering the issue of malice on the part of defend-
ant, and not of Thomas C. Noyes. Says Odgers in his work on
Libel and Slander, p. 270: "Such evidence must go to prove
that the defendant himself was actuated by personal malice
against the plaintiff. In an action against the publisher of a
magazine, evidence that the editor or the author of any article,
not being the publisher, had a spite against the plaintiff, is of
course inadmissible. *Robertson* v. *Wylde,* 2 Moody & R. 101;
*Clark* v. *Newsam,* 1 Exch. 131, 139, 16 L. J. Exch. N. S. 296;
*Carmichael* v. *Waterford & L. R. Co.* 13 Ir. L. Rep. 313."

The publication of the article in question not being any part
of the duties of Thomas C. Noyes in connection with defendant
corporation, and the alleged communication not having oc-
curred contemporaneously with the publication of the article,
and therefore not being part of the *res gestæ,* he was not acting
within the scope of his agency, and he could not, therefore, bind
defendant by any statement he may have made in relation to
the publication. *Vicksburg & M. R. Co.* v. *O'Brien,* 119 U. S.
99, 30 L. ed. 299, 7 Sup. Ct. Rep. 118; *Goetz* v. *Bank of Kan-
sas City,* 119 U. S. 551, 30 L. ed. 515, 7 Sup. Ct. Rep. 318;
*Hayzel* v. *Columbia R. Co.* 19 App. D. C. 359.

The written statement was also inadmissible, since Ashford testified at the trial, and there is nothing to show that he had not a distinct recollection of all that occurred at the alleged conversation. *Sechrist* v. *Atkinson,* 31 App. D. C. 1; *Gurley* v. *MacLennan,* 17 App. D. C. 170; *Vicksburg & M. R. Co.* v. *O'Brien,* 119 U. S. 99, 30 L. ed. 299, 7 Sup. Ct. Rep. 118; *Crawford* v. *United States,* 30 App. D. C. 1.

Error is assigned by plaintiffs upon the refusal of the court below to admit in evidence six newspaper articles published in defendant's paper, purporting to criticize the official conduct of plaintiff Ashford. Three of these articles were published before and three after the date of the publication of the alleged libel. While they relate to the conduct of the inspector's office by Ashford, they have no reference to the subject-matter of the present publication. It is insisted by counsel for plaintiffs that they relate to the same subject-matter, in that they tend to criticize the administration of the inspector's office. The subject-matter of the alleged libel relates to the execution and carrying out of a contract for the construction of a particular building, and merely because the inspector of buildings happened to be connected with it, as with thousands of other official matters connected with the administration of this office, many of which appeared, from time to time in the daily papers, would not justify all such references being dumped into the present case.

We think the rule is well established in this country, that to make extrinsic newspaper articles competent to establish malice they must relate directly to the subject in which the libel originated. The articles excluded had no reference whatever to the subject-matter of the present publication. While there is some conflict in the authorities on this subject, the great weight favors the admission of only such utterances as relate directly to the subject of the alleged libel. The rule is well stated in *Root* v. *Lowndes,* 6 Hill, 518, 41 Am. Dec. 762, where the court said: "When the plaintiff does not go beyond the words laid in the declaration, I see no reason why he may not show that

those words have been spoken on a dozen different occasions. \* \* \* But very different considerations arise when we come to actionable words which are not laid in the declaration. To admit the proof of such words must be a surprise upon the defendant. It cannot be supposed that he will be prepared to try a matter of which the plaintiff has not complained. That is not all. If the plaintiff may prove the words, the defendant may justify as to those words; and thus the court and jury will be led off from the point in controversy as presented by the pleadings, into the trial of an indefinite number of collateral issues."

Counsel for plaintiffs rely chiefly upon an article in Wigmore on Evidence, where the author severely criticizes the decision in *Root* v. *Lowndes.* This criticism is answered in *Ball* v. *Evening American Pub. Co.* 237 Ill. 592, 86 N. E. 1097, as follows: "Whether subsequent publications of independent libels differing in character from the first, not connected therewith and not counted upon, may be proven for the purpose of showing malice of the defendant, is a question in reference to which the authorities are in conflict. It has never been passed upon by this court. The defendant, in this connection, relies principally upon the case of *Root* v. *Lowndes, supra.* Plaintiff says that case has been repudiated and discredited by a discussion found in Wigmore on Evidence. The judgment in that cause was the pronouncement of able judges. To their professional knowledge, theoretical in character, had been added wisdom acquired by long experience in the actual practice and administration of the law in the courts. We do not regard the force of that adjudication as an authority as at all weakened by Prof. Wigmore's unfavorable criticism of the court's views."

As suggested in *Root* v. *Lowndes, supra,* to have admitted the articles offered would have been equivalent to instituting a separate trial as to the truth of each, in order to determine whether its publication was malicious, which would have entailed endless confusion over collateral matters. The reason for confining the rule to utterances relating to the same subject is manifest, in that the proof adduced as to the alleged libelous

publication will relate directly to the matters sought to be introduced. There was no error in excluding the evidence.

The judgments are affirmed, with costs. *Affirmed.*

A motion by the appellants for a reargument was overruled March 2, 1914.