Katherine T. WALLACE, Appellant,

v.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM, et al., Appellees.

Nos. 96–CV–34, 96–CV–739.

District of Columbia Court of Appeals.

Argued Oct. 9, 1997.

Decided July 30, 1998.*

---

* An opinion in these appeals was issued on January 15, 1998, but subsequently withdrawn.

wrongful discharge which was brought by Katherine T. Wallace, Ph.D., a former associate of the law firm of Skadden, Arps, Slate, Meagher & Flom, against the firm and several of its partners and associates. The plaintiff alleged, *inter alia*, that her character and professional qualifications had been defamed by the defendants in a number of performance evaluations and other communications, and that she had subsequently been discharged, in part, in retaliation for her adherence to the Rules of Professional Conduct. The first trial judge dismissed the complaint for failure to state a claim on which relief may be granted, holding that the communications in question were not defamatory; that even if the communications were defamatory, they were absolutely privileged because Ms. Wallace had consented to them; that several of the defamation counts were time-barred; and that the wrongful discharge claim was precluded by the "at-will" employment doctrine. On appeal, the plaintiff challenges all of these rulings.

We hold that the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning. Accepting as true the allegations of the complaint for purposes of the defendants' motion to dismiss, we conclude that the plaintiff did not consent to at least some of the allegedly defamatory communications, and that these communications were protected by a qualified privilege but not by an absolute one. Because the plaintiff has sufficiently alleged malice, we hold that the complaint was erroneously dismissed. We agree with the trial judge that several of the defamation counts are time-barred, and we affirm the dismissal of the wrongful discharge claim.

Appeal No. 96–CV–739 arises from a second action which was filed by the plaintiff shortly after the dismissal of the first. In the second case, Ms. Wallace, a black married woman, alleged that Skadden, Arps had discriminated against her on account of race and marital status with respect to her employment opportunities, in violation of the

Katherine T. Wallace, pro se.

Janet L. Goetz, Washington, DC, for appellees.**

** Barbara B. Brown, Neal D. Mollen and Abbey G. Hairston filed supplemental memoranda for appellees.

Before SCHWELB and REID, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

This case presents us with two related and consolidated appeals. The first, No. 96–CV–34, arises from an action for defamation and

District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* (1992). The second trial judge dismissed the complaint on grounds of claim preclusion and because, in his view, the individual partners were not amenable to suit. We conclude that the second complaint must be reinstated.

## I.

## THE FIRST ACTION

### A. *The trial court proceedings.*

According to the allegations of her 303–paragraph complaint, the plaintiff is a 1993 graduate of the Georgetown University Law Center. During the summer following her second year at Georgetown, she served as a summer associate with Skadden, Arps. At the conclusion of that summer, the plaintiff was offered a position as an associate with the firm. She subsequently accepted the offer, and she was employed as an associate from 1993 until her discharge in September 1995.

Ms. Wallace's career with Skadden, Arps was a stormy one. She was initially assigned to the International Trade Group and subsequently transferred to the Communications Group. In each of these assignments, the plaintiff became embattled with a number of partners and senior associates who criticized her performance; she, in turn, accused these lawyers of defaming her. The first action arises from the defendants' negative assessments of the plaintiff's work and attitude and from her ultimate dismissal from the firm under less than cordial circumstances.

The essence of the plaintiff's complaint is that she is a superbly qualified[1] and highly ethical attorney, and that the defendants, or some of them, "perceived Plaintiff's extensive credentials and expertise to be a professional threat to them." The plaintiff also claims that during her career at Skadden, Arps, she became aware of various "instances of misfeasance and malfeasance, legal malpractice and [unethical conduct]." She alleges that in accordance with her perceived responsibilities under the Rules of Professional Conduct, she brought these improper activities to the attention of her superiors. The plaintiff claims that she was repeatedly defamed and ultimately discharged in retaliation for her reporting of wrongdoing at Skadden, Arps, and, apparently, because some of her superiors were unable to cope with a person of her qualifications.

The complaint in the first case was filed on November 1, 1995. Most, but not all, of the defamatory statements of which the plaintiff complains are alleged to have been made more than one year before the suit was filed. The plaintiff asserts that prior to November 1, 1994, the defendants falsely and maliciously stated, *inter alia,*

1. that the plaintiff "played hookie" and had poor and unreliable work habits;

2. that she frequently failed to meet deadlines;

3. that she produced work of "inferior quality," some of which was "not worth reading";

4. that she was unwilling to work on weekends or to devote sufficient time and energy to her assignments, and that she used her children as an excuse for poor performance;

5. that her billings were low, compared with those of other associates;[2]

6. that she had an "attitude problem" and behaved in an unruly manner; and

---

**1.** According to the complaint, the plaintiff has an impressive academic background. She holds a B.A. degree in French and German Literature and Language and Master's degrees in German Studies and in Comparative Literature. She has also been awarded a Ph.D degree by Harvard University, and has been employed as a university professor.

The *pro se* complaint is also replete with references to the plaintiff's brilliance and accomplishments. For example, the plaintiff alludes to her "academic excellence and superlative writing skills," to her "reputation for intellectual achievement and outstanding academic performance," to her "expertise and demonstrated excellence in research," and to her "proven excellence in legal research and writing."

**2.** In this connection, according to the complaint, the plaintiff accused the defendants at the time of trying to "ice" her by conspiring not to give her work, so that she would have low billings and could eventually be discharged.

7. that, as an excuse for one of her absences from the office, she falsely claimed that the ceiling of her home had fallen.

With respect to the period after November 1, 1994, the complaint alleges that the defendants falsely and maliciously represented that the plaintiff was frequently out of the office during office hours. According to the plaintiff, the defendants further defamed her by stating that one client was so displeased with the poor quality of the plaintiff's work that a representative of the client had asked the plaintiff's superiors not to assign the plaintiff to any more of that client's matters. The plaintiff also claims that she was terminated on or about September 20, 1995, effective immediately, that she was effectively locked out of the firm's offices by the inactivation of her access key, and that by terminating her employment in this manner, the defendants

> maliciously published a false and defamatory communication to the effect that Dr. Wallace had performed some unspecified disgraceful, immoral and/or dishonest act, Skadden, Arps having previously terminated attorneys in a similar manner only when such attorneys had been caught stealing, engaging in insider training, or engaging in child molestation.

Finally, the complaint alleges that following the plaintiff's dismissal, Skadden, Arps attorneys were directed to respond to any inquiries by potential employers as to the plaintiff's qualifications by providing only the dates of the plaintiff's employment; according to the plaintiff, an employer reference providing only this information "is a well known code in the legal community for 'do not hire.'"

On November 21, 1995, the defendants filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted. On December 8, 1995, the first trial judge signed an order dismissing the complaint "for the reasons stated by the defendants in their motion."[3] This timely appeal followed.

---

3. These reasons are synopsized in our brief description of the judge's order on page 875, *supra*. The complaint also included a claim of intentional infliction of emotional distress. The trial judge dismissed that claim, and the plaintiff has not appealed from that part of the judge's decision.

## B. *The defamation claim.*

### (1) *The standard of review.*

The question whether the first complaint states a claim upon which relief may be granted is one of law, and our review of the trial judge's disposition is therefore *de novo. Abdullah v. Roach,* 668 A.2d 801, 804 (D.C. 1995) (citation omitted). A pleading "should not be dismissed for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail. *Atkins v. Industrial Telecomms. Ass'n, Inc.,* 660 A.2d 885, 887 (D.C. 1995) (citations omitted).

### (2) *Defamatory meaning.*

The defendants contend that the complaint fails to state a claim upon which relief may be granted because, according to them, the plaintiff has not alleged any representation by the defendants which could, as a matter of law, constitute actionable defamation. We do not agree.

"A statement is 'defamatory' if it tends to injure the plaintiff in [her] trade, profession or community standing, or lower [her] in the estimation of the community." *Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C. 1990) (citations and internal quotation marks omitted). "If it appears that the statements are at least capable of a defamatory meaning, [then] whether they were defamatory and false are questions of fact to be resolved by the jury." *Id.* "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful business, trade or profession ... is

subject to liability without proof of special harm." RESTATEMENT (SECOND) OF TORTS § 573 (1977).

■ Even if we consider only the representations alleged to have been made by the defendants after November 1, 1994, see p. 877, *supra*, we are satisfied that these statements are, at least, capable of a defamatory meaning. An allegation that an attorney is often out of the office during normal working hours, although perhaps inconclusive on its face, could reasonably be construed, in context,[4] as a reflection on her professional performance. A false representation that a client is sufficiently dissatisfied with an attorney's work to seek the attorney's removal from the client's matters is patently defamatory. The defendants' alleged non-verbal representation (by inactivating the plaintiff's access key and thus effectively locking her out of the office) that she had done something disgraceful cannot fairly be characterized as non-defamatory as a matter of law.[5] Finally, the defendants' alleged coup-de-grace—a directive to all attorneys to convey to prospective employers the coded message that the plaintiff should not be hired—tends

to injure the plaintiff's reputation in her profession.

It may be that, at some subsequent stage of the case, the defendants will be able to present a defense of truth[6] or legitimate expression of opinion,[7] or that the plaintiff will be unable to make an adequate showing of malice. Such a determination cannot, however, be made on the basis of the complaint, standing alone.

### (3) Privilege.
#### (a) Implied consent.

The defendants claim that the communications of which the plaintiff complains are absolutely privileged. They point out that Ms. Wallace was a summer associate at Skadden, Arps in 1992. According to the defendants, the plaintiff therefore knew or should have known that, when she was hired as an attorney associated with the firm, she would receive performance evaluations from her superiors. The defendants assert that by accepting a position as an associate, the plaintiff consented to such evaluations, whether favorable or unfavorable. The defendants argue with considerable force that

---

4. Although, as we hold below, defamatory statements made by the defendants prior to November 1, 1994 cannot form the basis for liability in this case, they may shed light on the meaning and effect of subsequent representations. *See, e.g., FTC v. Cement Inst.*, 333 U.S. 683, 704–05, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (citation omitted); *Clark v. United States*, 593 A.2d 186, 195 (D.C.1991). Prior uncomplimentary entries in the plaintiff's file with respect to her work habits may be relevant to the question whether the representation here at issue—that she was frequently out of the office—was defamatory.

5. Actionable defamation is not necessarily restricted to verbal conduct. Indeed, it has been "extended to ... conduct carrying a defamatory imputation, such as hanging the plaintiff in effigy [or] erecting a gallows before his [or her] door...." W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 112, at 786 (5th ed.1984) (footnotes omitted); *see also Bonkowski v. Arlan's Dep't Store*, 383 Mich. 90, 174 N.W.2d 765, 767 (1970) (dramatic pantomime); Gregory G. Sarno, Annotation, *Libel or Slander: Defamation by Gestures or Acts*, 46 A.L.R.4th 403 (1986).
In holding that the defendants' alleged conduct in inactivating the plaintiff's access key is capable of a defamatory meaning, we must, of course,

accept as true the allegation that this treatment was ordinarily meted out only to attorneys who had engaged in criminal or unethical activity. If the record were to show that the access keys of all departing employees are routinely inactivated, then the court would be confronted with an entirely different case.

6. *E.g.*, the plaintiff alleges in her complaint that the defendants defamed her by claiming that she had an "attitude problem." Elsewhere in the complaint, she asserts that she told a senior associate "that she did not need [him] to teach her how to write ... [because] she was ... teaching writing [at] Stanford University ... while he was still in high school," that she told this senior associate "to stay out of my face" and to "back off," and that she wrote a memorandum to her supervisors in which she described him as "irresponsible, unethical, ... stupid and ... dangerous." See p. 886, *infra*.

7. *See generally* ROBERT D. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS § IV 3, at 164–85 (1980). "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566 (1977).

an employee should not be permitted to recover damages against her employer simply because she disagrees with the employer's appraisal of her performance. They warn of a slippery slope if the complaint is not dismissed.

The concerns expressed by the defendants are legitimate,[8] but we do not agree with the contention that an employer's statements regarding the performance or conduct of an employee are *absolutely* privileged. If we were to accept the defendants' legal theory, then it would logically follow that the plaintiff could not recover for false and defamatory statements by her employer if she proved that these statements were made with actual malice. The defendants would thus escape liability even if, *e.g.*, they falsely and maliciously represented to interested third parties, or to each other, that the plaintiff had embezzled client funds. This position runs counter to at least a century and a half of applicable jurisprudence.

■ The law has long recognized a privilege for anything "said or written by a master in giving the character of a servant who has been in his [or her] employment." *White v. Nicholls,* 44 U.S. (3 How.) 266, 287, 11 L.Ed. 591 (1845); *Washington Times Co. v. Bonner,* 66 App. D.C. 280, 284, 86 F.2d 836, 840 (1936). The privilege in question, however, exists only "in the absence of malice"; it is a "*qualified* privilege." *Washington Times Co., supra,* 66 App. D.C. at 284, 86 F.2d at 840 (emphasis added); *Smith v. District of Columbia,* 399 A.2d 213, 220–21 (D.C. 1979); *Elliott v. Healthcare Corp.,* 629 A.2d 6, 9 (D.C.1993); *Columbia First Bank v. Ferguson,* 665 A.2d 650, 656 (D.C.1995); *Edwards v. James Stewart & Co.,* 82 U.S.App. D.C. 123, 124, 160 F.2d 935, 936 (1947).

■ In order to overcome the privilege, it is "incumbent on the party complaining to show malice." *White, supra,* 44 U.S. (3 How.) at 287. "The communication being privileged, defendant will be presumed to have been actuated by pure motives in its publication." *Ashford v. Evening Star Newspaper Co.,* 41 App. D.C. 395, 405 (1914); *see also Ford Motor Credit Co. v. Holland,* 367 A.2d 1311, 1314 (D.C.1977) (*quoting Ashford* ).[9] If malice is shown, however, then the privilege is lost. "[T]he basis, if any, for excusing dissemination of a defamatory report ... within an employment group ... is ... the existence of a qualified privilege—a privilege which can be lost if the publication occurs outside normal channels, is otherwise excessive, *or was made with malicious intent.*" *District of Columbia v. Thompson,* 570 A.2d 277, 292 (D.C.1990) (emphasis added), *modified in part on other grounds,* 593 A.2d 621 (D.C.), *cert. denied,* 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991); *see also Thomas v. Howard,* 168 A.2d 908, 909–10 (D.C.1961). The claim that the privilege is an absolute one has been explicitly rejected by courts and commentators alike. *See, e.g., Thomas, supra,* 168 A.2d at 910; *Walsh v. Consol. Freightways, Inc.,* 278 Or. 347, 563 P.2d 1205, 1210 (1977) (citing, *inter alia,* W. Prosser, The Law of Torts § 115, at 792–96 (1971)).

The defendants' theory appears to be that, at least in the context of a law firm, every employee, solely by virtue of the fact that she is an employee, consents to any comments on her performance by the employer or its agents. Were we to accept that position, we would effectively convert what has long been recognized as a qualified privilege into an absolute one, contrary to the extensive line of cases cited at page 879, *supra.*[10] We do not

---

8. *See, e.g., Schrader v. Eli Lilly & Co.,* 639 N.E.2d 258 (Ind.1994):

> Intracompany communications regarding the fitness of an employee are·protected by the qualified privilege, in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs.... The privilege *protects personnel evaluation information communicated in good faith.* Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law.

*Id.* at·262 (citation omitted).

9. The court further stated in *Ashford* that "[b]efore the inference of express malice can be indulged, the publication must, in comment, be so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that defendant was actuated by express malice." 41 App. D.C. at 405.

10. The defendants seek to distinguish the decisions recognizing only a qualified privilege in employer-employee situations on the ground that

believe that the case law relied upon by the defendants supports so extreme a position.

In *Farrington v. Bureau of Nat'l Affairs*, 596 A.2d 58 (D.C.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1944, 118 L.Ed.2d 549 (1992), the plaintiff's employer was required by the terms of a collective bargaining agreement to prepare evaluations of each employee's performance. The plaintiff, who was a party to the agreement, sued the employer for allegedly defamatory statements in his supervisors' evaluations of his work. This court affirmed an order granting summary judgment in favor of the employer, holding that consent is an absolute defense to defamation, and that

> [b]ecause appellant effectively agreed to a written evaluation of his work by his supervisors, he consented to the publication of statements within the limitations prescribed by *Kraft v. W. Alanson White Psychiatric Found.*, [498 A.2d 1145, 1150 (D.C.1985)] *i.e.*, the statements must be relevant to the quality of his work, and the publication of those statements must be limited to those with a legitimate work related interest in those statements.

*Id.* at 60. The court rejected the plaintiff's contention that "his consent to the publication of the evaluation does not preclude the court from assessing the accuracy of the evaluation." *Id.* at 59.

The court's decision in *Farrington* that the plaintiff had consented to an unfavorable evaluation, however, was explicitly predicated on the existence of the collective bargaining agreement to which the plaintiff was a party. Indeed, as the court noted, the plaintiff "[did] not dispute that he consented to the publication," *id.*, and he argued only that his consent did not bar his suit. In the present case, on the other hand, the plaintiff denies that she consented to the defendants' allegedly defamatory publications,[11] and there is no collective bargaining agreement upon which a finding of consent can be predicated. Indeed, the plaintiff alleges, and the defendants concede, that she was an at-will employee. Thus, assuming that the decision in *Farrington* would have been the same even if the employer had maliciously accused the plaintiff of dishonest conduct,[12] that case is different from the present one in critical respects.

■ The defendants also rely on *Kraft*, *supra*, and on *Joftes v. Kaufman*, 324 F.Supp. 660, 662–63 (D.D.C.1971), but these decisions are also distinguishable, essentially on the grounds that differentiate the present case from *Farrington*. In both *Kraft* and *Joftes*, the determination that the plaintiff had given his implied consent to the publication of allegedly defamatory statements was based on the existence of a contractual relationship between the plaintiff and the defendant. In each instance, the contract in question provided for or contemplated the publication of the evaluations of which each plaintiff was complaining.[13] In the present

---

the defense of consent was not explicitly raised in those cases. We have held that "the rule of *stare decisis* is never properly invoked unless the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." *District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C.1996) (citations omitted). As Judge Learned Hand has written, however, "we cannot treat [prior decisions] as judicial fiat; the premises implicit in the solution are as authoritative as the solution itself." *Murray v. Roberts*, 103 F.2d 889, 894 (2d Cir.1939), *cert. dismissed*, 311 U.S. 720, 60 S.Ct. 1106, 85 L.Ed. 469, 470 (1940). If, as the defendants suggest, an employee should be deemed to have implicitly consented to a defamatory evaluation simply by being an employee, then the courts which have held that the employer has only a qualified privilege could not properly have decided the cases before them in the manner that they did.

**11.** But see discussion at pp. 881–82, *infra*.

**12.** The substance of the allegedly defamatory statements in *Farrington* was that the plaintiff was careless and inaccurate and that his work was unsatisfactory. *Id.* at 58–59 n. 1. Although the court referred to the defendant's privilege as absolute, it is not obvious that the employer would or should have prevailed even if the plaintiff's supervisors had falsely stated in their evaluations that the plaintiff had embezzled company funds or molested his secretary's five-year-old daughter.

**13.** In *Joftes*, as in *Farrington*, the contract was a collective bargaining agreement. In *Kraft*, there was no collective bargaining agreement, but the decision was based on the existence of a contract between the plaintiff, who was a graduate student, and the institution that he attended; the court held that this contract implicitly authorized the evaluations of which the student complained.

*Kraft* may profitably be compared with *Greenya v. George Washington Univ.*, 167 U.S.App. D.C.

case, at least in the absence of a contract or of some affirmative act of consent, the defendants' allegedly defamatory communications were protected by a qualified privilege only.

(b) *The plaintiff's requests for evaluations.*

The defendants contend, however, that the plaintiff affirmatively consented to the communications of which she now complains. They rely on the allegation in Ms. Wallace's complaint that in April 1994, after her work had been criticized by several Skadden, Arps attorneys, the plaintiff told her superiors "that she had worked with at least eight other attorneys on various projects and requested to hear the evaluations of those other eight attorneys." Complaint, para. 133. The plaintiff also asked two attorneys to "specify their complaints about the quality of her work." *Id.*, para. 135. Finally, the plaintiff alleges that she prepared a memorandum in which she listed all of the

attorneys with whom she had worked and requested that each of these attorneys be required to submit a written evaluation of her performance. *Id.*, para. 138. The defendants claim, in effect, that with respect to any negative evaluations that were published after the plaintiff made these requests, she only got what she asked for, and that the communications in question are therefore absolutely privileged. In light of our decisions in *Farrington* and *Kraft*, the defendants' point is not without some force.[14]

But assuming, contrary to the plaintiff's emphatic allegations,[15] that her requests for evaluations were voluntary, we do not believe that they can fairly be viewed as constituting consent at least to some of the defamatory communications which were allegedly made within the limitations period. Specifically, the plaintiff claims that the defendants falsely and maliciously represented

---

379, 386, 512 F.2d 556, 563, *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975). In *Greenya*, there was no contractual claim of the kind made in *Kraft*, and the court held that faculty members of educational institutions "enjoy a qualified privilege to discuss the qualifications and character of fellow officers and faculty members, if the matter communicated is pertinent to the functioning of the educational institution," but that this qualified privilege may be overcome, *inter alia*, by proof "that publication was made with malicious intent."

14. *Cf.* RESTATEMENT (SECOND) OF TORTS § 583 cmt. d(2) (1977):

A, a school teacher, is summarily discharged by the school board. He demands that the reason for his dismissal be made public. B, president of the board, publishes the reason. A has consented to the publication though it turns out to be defamatory.

"The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute." *Id.*, cmt. f. *See also Conkle v. Jeong*, 73 F.3d 909, 917–18 n. 1 (9th Cir. 1995), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996), (alternative holding) (where employee induced employer to repeat defamatory comments to friends of employee posing as prospective employers, she consented to these comments, and absolute privilege applied).

15. In characterizing the defendants' conduct in her Reply Brief, the plaintiff does not mince her words:

First, when paragraph 138 is read in the context of the entirety of Count VIII in which it is contained, it is clear that Dr. Wallace's ac-

tions in making the request were not voluntary, therefore no consent can be found. Rather, Dr. Wallace was summoned with a "follow-up" review of which she had no knowledge or notice until she entered the room. There, she was confronted with a *fait accompli* of which she had no prior knowledge or notice, that this was her *second negative review*, that this was a serious situation, R. at 53–54, ¶ 132, from which she reasonably inferred that she was about [to] be fired.

Only then [sic] did Dr. Wallace ask to hear the evaluations of the other eight attorneys with whom she had worked, believing that they had had more positive reactions. R. at 54, ¶ 133. She later put her request in writing, *after learning that she was being railroaded by a sham evaluation*. R. at 54–55, ¶¶ 135–138.

The situation is obviously one of tremendous duress in which Dr. Wallace, threatened with the loss of her job, raised the only defense she could in an attempt to limit the negative effects of an evaluation that had already taken place and whose results were foregone. *To say that Dr. Wallace consented to the evaluation is like saying that a woman who asks her rapist to put on a condom, consents to the rape.* Dr. Wallace, like the woman being raped, did the only thing she could to lessen the bad effects of a devastating event about which she had no choice. Dr. Wallace's actions in writing the Memorandum were defensive, not free or voluntary.

(Emphasis added.)

that a client had demanded the plaintiff's removal from all of that client's matters. She also alleges that, by inactivating her access key, the defendants treated her like terminated employees who had done something immoral or disgraceful, and thereby represented to others that she too had engaged in such conduct. We cannot say, as a matter of law, that the plaintiff's requests for evaluations rendered these alleged communications absolutely privileged. We therefore conclude that, notwithstanding the plaintiff's alleged consent, the complaint should not have been dismissed.[16]

#### (4) Statute of limitations.

■ In the District of Columbia, the statute of limitations for defamation is one year. *See* D.C.Code § 12–301(4) (1995). "Defamation occurs on publication, and the statute of limitations runs from the date of publication." *Foretich v. Glamour*, 741 F.Supp. 247, 252 (D.D.C.1990) (citations omitted); *see also Ogden v. Association of U.S. Army*, 177 F.Supp. 498, 502 (D.D.C. 1959). Where a statement is defamatory on its face, the plaintiff's reputation is damaged immediately upon publication. *Cf. Howard Univ. v. Best*, 484 A.2d 958, 988–89 (D.C. 1984).

■ The plaintiff does not deny that she was aware of the defamatory statements, of their publication, and of some injury at the time the statements were made. *Cf. Bussineau v. President & Dirs. of Georgetown College*, 518 A.2d 423, 425 (D.C.1986) (explaining "discovery rule"). Her right of action as to each statement therefore accrued at the time of that statement's publication.

The first sixteen counts of Ms. Wallace's twenty-four count complaint all relate to defamatory communications which the defendants allegedly made prior to November 1, 1994. Because the complaint was filed on November 1, 1995, more than a year after the conduct complained of, these counts are time-barred.

■ The plaintiff contends that the defendants' defamatory statements were all a part of a single continuing course of conduct, and that the statute of limitations therefore did not begin to run until after the conduct ceased following her discharge. We do not agree with this contention. The complaint alleges that the defendants made a number of discrete defamatory communications. Each of these statements constituted "a new assault on the plaintiff's reputation," and each therefore gave rise to a separate right of action. *Jones v. Howard Univ.*, 574 A.2d 1343, 1348 (D.C.1990). "[T]he running of the statute [cannot] be prevented by repetitions of the [defamation], although, of course, a separate action will lie for any repetition within the statutory time." 53 C.J.S. *Libel and Slander* § 122, at 206 (1987); and *see* authorities there cited.

The plaintiff relies heavily on *Page v. United States*, 234 U.S.App. D.C. 332, 729 F.2d 818 (1984), for the proposition that the "continuing tort" doctrine precludes the dismissal of the first sixteen counts of her complaint. In *Page*, a suit under the Federal Tort Claims Act, 28 U.S.C. § 2401(b) (1976), a veteran complained of injuries incurred as a result of allegedly inappropriate treatment by the Veterans Administration over a period of nineteen years. In holding that his complaint was not time-barred, the court stated:

> It is well-settled that when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases. Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable. Moreover, since one should not be allowed to acquire a right to continue the tortious conduct, it follows

---

**16.** Because the case must be remanded to the trial court, and because the relevant inquiry will be aided by factual development, we do not decide at this juncture the more difficult question whether the defendants' other alleged defamatory communications which occurred after November 1, 1994, see p. 877, *supra*, are absolutely privileged under the doctrine of consent. We note that, so far as we can determine, the communications that were published within the year preceding the filing of the complaint do not include evaluations from the eight individuals whose assessment of her work the plaintiff solicited.

logically that statutes of limitation should not run prior to its cessation.

*Id.* at 335–36, 729 F.2d at 821–22 (footnotes and internal quotation marks omitted). Ms. Wallace asserts that in the present case, the various defamations to which she claims to have been subjected likewise coalesced to cause harm to her reputation, and that they cumulatively led to her discharge from employment.

Assuming, *dubitante,* that the reasoning of *Page* could properly be applied to an action for defamation,[17] that decision can be of no assistance to the plaintiff. In *National R.R. Passenger Corp. v. Krouse,* 627 A.2d 489, 497–98 (D.C.1993), *cert. denied,* 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 30 (1994), this court declined to follow *Page* and rejected the federal appellate court's analysis. In *Krouse,* we held that once the plaintiff has been placed on notice of an injury and of the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the "continuous tort" doctrine inappropriate. *Id.* *Krouse* was a case under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1988), and its reasoning applies, *a fortiori,* to a defamation claim in which the plaintiff has alleged a number of separate and distinct slanders and libels. *See also Hendel v. World Plan Executive Council,* 705 A.2d 656, 667 (D.C.1997) (reiterating this court's refusal in *Krouse* to follow *Page* ).

## C. *The wrongful discharge claim.*

Closely tied in to the plaintiff's allegations of defamation is her claim that she was wrongfully discharged from her employment. She alleges in substance that several attorneys at Skadden, Arps engaged in various acts of misfeasance and unethical conduct, that she reported these improprieties to her superiors, and that she was first defamed and then fired for disclosing this wrongdoing.

The plaintiff has summarized as follows the improper conduct on the part of Skadden, Arps attorneys which she claims to have reported to her superiors:

(1) inadequate and incompetent supervision of junior associates,

(2) directing non-Spanish speaking attorneys and legal assistants to translate from English into Spanish portions of documents to be filed on behalf of clients, using a Spanish–English dictionary,

(3) lying to clients by altering the "as-filed" copies of documents after they had been filed,

(4) the fabrication of performance evaluations,

(5) a supervisor's false representation to a firm partner that he had prepared a document when he had in fact never read it,

(6) a supervisor's false representation to a firm partner that a client had requested that Dr. Wallace be prohibited from working on the client's matters.

Appellant's post-argument brief at 2 (numerals added; citations to the record omitted). Ms. Wallace contends that she was required by the Rules of Professional Conduct to report this wrongdoing to her superiors, that she would have been in violation of her ethical obligations as an attorney if she had failed to do so, and that her discharge for complying with the Rules was therefore wrongful.

The plaintiff relies, *inter alia,* on *Adams v. George W. Cochran & Co.,* 597 A.2d 28 (D.C.1991). We held in *Adams* that "a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." *Id.* at 34. The plaintiff asserts that the Rules of Professional Conduct, which were promulgated by this court and are binding on members of the Bar of the District of Columbia, are equivalent for present purposes to a statute or regulation. The defendants do not argue to the contrary.

The plaintiff has predicated her claim on Rules 5.1 and 5.2 of the Rules of Professional Conduct. We have set forth the text of each

---

**17.** The plaintiff has cited no case in which the "continuing tort" doctrine has been applied to slander or libel, and our own research has disclosed none.

of these Rules in the footnote.[18] Rule 5.1 sets forth the responsibilities of a supervisory attorney, and has no direct application to the plaintiff, who was a junior associate. Rule 5.2 focuses on the responsibilities of a subordinate lawyer, but its main thrust is to foreclose any "Nuremberg defense," i.e., a violation of the Rules is not excused even if the wrongful conduct was done at the direction of a supervisory lawyer. Neither of the Rules on which the plaintiff relies expressly imposes a duty upon the subordinate attorney to report anything to her superiors. Indeed, on their face, the two Rules appear to have nothing to do with any such claimed obligation.[19] Ms. Wallace has thus failed to demonstrate the existence of a legal obligation to report to her superiors the improper conduct which she claims to have observed.[20] Her complaint cannot be sustained under Adams.

This jurisdiction's case law with respect to the employment at-will doctrine was recently modified in some measure by our decision in Carl v. Children's Hosp., 702 A.2d 159 (D.C. 1997) (en banc) (per curiam). We have not yet had occasion to consider the question whether Carl applies retroactively to litigation which arose before that case was decided. But even if we assume that the new Carl standards may be invoked in this case, and that, to use the terminology of Carl, a duty to report perceived ethical violations to supervisory attorneys is "carefully tethered" or "firmly anchored" to Rules 5.1 and 5.2, id. at 164 n. 6 (Terry, J., joined by three other judges, concurring), id. at 197–98 n. 2 (Steadman, J., joined by one other judge, dissenting), the plaintiff still cannot prevail.[21]

18. **Rule 5.1. Responsibilities of a partner or supervisory lawyer.**

 (a) A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

 (b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

 (c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

 (1) The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

 (2) The lawyer has direct supervisory authority over the other lawyer or is a partner in the law firm in which the other lawyer practices, and knows or reasonably should know of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

 **Rule 5.2 Responsibilities of a subordinate lawyer.**

 (a) A lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.

 (b) A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

19. Rule 8.3(a) of the Rules of Professional Conduct, sometimes colloquially known as the "squeal" rule, reads as follows:

 **Rule 8.3. Reporting professional misconduct.**

 (a) A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substan-

tial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

Rule 8.3(a), however, requires the reporting of misconduct to the Office of Bar Counsel, rather than to a supervisory attorney. The plaintiff has not cited or relied upon Rule 8.3(a).

20. The plaintiff argues that a duty to report is implicit in Rules 5.1 and 5.2, because

 if a subordinate lawyer knows a particular course of action to be a violation of the Rules, she is required not to take such action. If, however, the question is reasonably arguable, she must raise it with a supervisor, in order to relieve herself of such responsibility and so that such supervisory lawyer can comply with his duty under Rule 5.1 to take reasonable remedial action to avoid or mitigate the consequences of the course of action. R. Prof. Cond. 5.1(b) and (c); see also Prof. Cond. R. 5.2, comment 2.

Appellant's post-argument brief at 1–2.

The complaint does not allege any occasion on which the plaintiff consulted a supervisor with respect to a "reasonably arguable" ethical question, and the contention quoted above appears inapposite to this case. In any event, the Rules on which the plaintiff relies do not give rise to the kind of clear and unequivocal duty which would bring this case within the rule of Adams, supra.

21. Judge Reid believes that the better test is whether there is "a clear mandate of public policy," and that "[t]he sources of public policy 'include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy.' "

■ Ms. Wallace claims, as we have seen, that she was fired in reprisal for reporting six numbered categories of alleged wrongdoing to supervisors in the law firm for which she was working. See p. 883, *supra*. Of these six categories, the first two (inadequate supervision of junior attorneys and toleration of inadequate translations into Spanish) are more fairly characterized as poor management or foreign language deficiencies than as unethical conduct. Categories 4, 5 and 6 deal with situations in which attorneys with whom the plaintiff was embroiled in accusations and counter-accusations are said to have lied about other attorneys' assessments of the plaintiff's work (No. 4), about the true authorship of a memorandum (No. 5), or about a client's alleged dissatisfaction with the plaintiff's work (No. 6). Without condoning mismanagement or lack of forthrightness in office procedures and communications (if, as plaintiff has alleged, either of these conditions existed at Skadden, Arps), we do not believe that Rules 5.1 or 5.2 could reasonably be construed as requiring an attorney to report to Bar Counsel, or to a partner, the type of conduct here alleged by the plaintiff, nor is that conduct sufficient to trigger the application of a "public policy" exception to the "at-will doctrine." *See, e.g., House v. Carter–Wallace, Inc.,* 232 N.J.Super. 42, 556 A.2d 353, 356, *cert. denied,* 117 N.J. 154, 564 A.2d 874 (1989); *see also Carl, supra,* 702 A.2d at 182 (Schwelb, J., joined by three other judges, concurring).

Ms. Wallace's remaining allegation of wrongdoing presents a more substantial problem. The conduct which she claims to have reported to her superiors includes "lying to clients by altering the 'as-filed' documents after they had been filed." It is not clear from the complaint whether these alleged alterations were substantive. Because we must construe the complaint in the light most favorable to the plaintiff, however, we assume that the plaintiff is alleging that the defendants made material alterations which changed the meaning of the documents in question, rather than technical corrections which did not.[22] If Skadden, Arps attorneys made material alterations in documents without making appropriate disclosures and without obtaining the client's consent, such conduct was not only improper but seriously so. *Cf. In re Reback,* 513 A.2d 226 (D.C.1986) (en banc) (forgery of client's signature); *see also In re Abrams,* 689 A.2d 6, 22–23 (D.C.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2515, 138 L.Ed.2d 1017 (1997) (surveying cases involving dishonest conduct by attorneys).

If the plaintiff had alleged that she was discharged solely, or perhaps even primarily,[23] for reporting the alteration of "as filed" documents, and for no other reason, we would have a different case. Ms. Wallace, however, makes no such claim. Indeed, the alleged alteration of documents is said to have occurred, and to have been reported, in December 1993, approximately three months after the plaintiff came to work for Skadden, Arps, and long before she was fired in September 1995. Most of the alleged wrongdoing of which the plaintiff complains occurred well after the alteration incidents, but before her discharge. Accepting the description in the complaint of the sequence of events, the reporting of the alleged alterations was, at most, an early and comparatively minor contributing factor to the termination of Ms. Wallace's employment twenty-one months later. A great many other events intervened.

Moreover, it is apparent from the plaintiff's complaint that the reporting of alteration of documents represents but one of many reasons for which she claims to have been fired. She asserts, for example, that she was also defamed and ultimately discharged because "certain [d]efendants perceived [p]laintiff's extensive credentials and expertise to be a professional threat to them." The plaintiff further alleges that one of the senior associates maliciously defamed

*Carl v. Children's Hosp., supra,* 702 A.2d at 192 (Mack, J., concurring) (quoting *Pierce v. Ortho Pharm. Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980)).

**22.** Although any alteration of a document after it has been filed is inappropriate, the correction of an error in spelling or syntax would of course be quite different, for present purposes, from a substantive change which was intended to deceive.

**23.** See note 25, *infra.*

her in August 1994 "in retaliation for Dr. Wallace's refusal to cancel her daughter['s] ... sixth birthday party,"[24] and that this also contributed to her discharge. She also attributes her firing to the reporting of five categories of alleged wrongdoing which, we have held, she had no ethical duty to report.

Finally, the plaintiff's own description of her career at Skadden, Arps reveals that she frequently acted in a manner that reasonable people would be likely to view as disrespectful and objectionable. The complaint alleges, for example, that after Richard A. Hindman, an associate who was supervising the plaintiff, sharply criticized her writing,

> Dr. Wallace responded angrily and forcefully to the effect that she did not need Hindman to teach her how to write, that she was already teaching writing in Stanford University's Structured Liberal Education Program while Hindman was still in high school and that what she needed from Hindman was to train her in the practice of Communications law, which he had failed to do. Dr. Wallace further stated that Hindman should simply leave her alone so that she could properly complete the assignment[.] [T]hen she forcefully directed Hindman to "just stay out of my face."

The complaint describes several other comparable incidents, and it is evident from the plaintiff's own narrative that she felt free to lecture, scold and "direct" attorneys who had been assigned to supervise her work. The plaintiff's complaint thus depicts a working environment in which she and several of her superiors were frequently, if not constantly, at each other's throats.

The narrow exceptions to the "employment at-will" doctrine which we have recognized in *Adams* and *Carl* were not designed to prevent an employer from terminating an at-will employee in order to eliminate unacceptable internal conflict and turmoil. It matters little, if at all, who was most at fault. An employer is not required to tolerate an intolerable working environment.

It takes more than the plaintiff has alleged to invoke a "public policy" exception to the at-will doctrine. *See Carl, supra; cf.* 82 AM.JUR.2D *Wrongful Discharge* § 15, at 688 (1992). For the reasons stated above, the plaintiff's own complaint reveals that she was not terminated solely, or even substantially,[25] for engaging in conduct protected by such an exception. Accordingly, her claim for wrongful termination fails.

## II.

### THE SECOND ACTION

On February 9, 1996, less than two months after the first judge dismissed her first complaint, the plaintiff filed a second action alleging that Skadden, Arps and three of its partners[26] engaged in employment discrimination against her on account of her race and marital status, in violation of the District's Human Rights Act, D.C.Code §§ 1–2501 *et seq.* (1992). She claimed that the defendants had discriminated against her on these prohibited grounds with respect to (1) her compensation; (2) the terms and conditions of her employment; (3) her discharge; and (4) referral for employment.

Relying on the first trial judge's disposition of Ms. Wallace's first complaint, the defendants moved to dismiss the second complaint on the basis of claim preclusion. The individual defendants also asserted that they were not amenable to suit under the Human Rights Act. On May 10, 1996, the second

---

24. The plaintiff had told the supervising associate that she could not work on a Saturday on account of this party. She claims that the associate defamed her by telling her, within the hearing of others, that "[y]ou have to learn to respect deadlines."

25. In *Adams*, we stated, with one judge dissenting on the issue, that an exception to the at-will doctrine will be made only where the plaintiff was discharged "solely" for a prohibited reason. In *Carl*, however, we upheld a complaint alleging that the plaintiff was discharged for two discrete reasons (testifying before the Council against tort reform and serving as an expert witness for plaintiffs). We did so even though only the first of these reasons was deemed sufficient to implicate a "public policy" exception. *Carl, supra,* 702 A.2d at 165 n. 2 (Terry, J., concurring); *id.* at 186 n. * (Schwelb, J., concurring).

26. The three partners were also named as defendants in the first complaint.

trial judge, in a brief written order, sustained the defendants' motion on both grounds. The appeal in No. 96–CV–739 followed.

### A. Res judicata.

In opposition to the defendants' motion, the plaintiff filed an affidavit and the deposition testimony of a former Skadden, Arps attorney.[27] Viewed in the light most favorable to the plaintiff,[28] these materials could arguably permit an impartial trier of fact to find that the plaintiff was previously unaware of the existence of the defendants' alleged discriminatory practices, and that she could not have discovered them by exercise of reasonable diligence prior to the dismissal of the first complaint.

"[O]nce a claim is finally adjudicated, the doctrine of claim preclusion will operate to prevent the same parties from relitigation of not only those matters actually litigated but also those which might have been litigated in the first proceeding." *Stutsman v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.*, 546 A.2d 367, 369–70 (D.C.1988) (citations and internal quotation marks omitted). "It is the factual nucleus, not the theory upon which [the] plaintiff relies, which operates to constitute the cause of action for claim preclusion purposes." *Id.* at 370 (citation omitted). "[N]ewly discovered evidence normally does not prevent the application of *res judicata.*" *Guerrero v. Katzen*, 249 U.S.App. D.C. 206, 208, 774 F.2d 506, 508 (1985) (citation omitted).

"[A]n [e]xception[ ] to this general principle occur[s], [however], when evidence . . . could not have been discovered with due diligence." *Id.* (citing *Costantini v. Trans*

*World Airlines*, 681 F.2d 1199, 1202–03 (9th Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982)). "Of course, nothing in the rule against splitting a cause of action prevents a plaintiff from later bringing claims that . . . could not have been anticipated when the first suit was filed." *U.S. Indus., Inc. v. Blake Constr. Co., Inc.*, 246 U.S.App. D.C. 326, 336 n. 21, 765 F.2d 195, 205 n. 21 (1985). Because the plaintiff has fairly alleged that, even with due diligence, she could not have discovered the discrimination when she brought the first suit, the complaint in the plaintiff's second suit should not have been dismissed.[29]

### B. Amenability of partners to suit.

The trial judge dismissed the complaint against the three Skadden, Arps partners on the ground that, under the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* (1992 & Supp.1998), these defendants are not amenable to suit in their individual capacities. The plaintiff contends that the judge erred in this regard. We agree with the plaintiff.

To determine whether Ms. Wallace has a right of action against the partner defendants, we look first to the language of the statute. The Human Rights Act makes it unlawful, *inter alia*, for an employer to discriminate against an individual on account of race, marital status, or other prohibited ground, with respect to that individual's "compensation, terms, conditions, or privileges of employment." D.C.Code § 1–2512(a)(1) (Supp.1998). "Employer" is defined as

any person who, for compensation, employs an individual, except for the employer's parent, spouse, children or domestic

---

27. Because factual submissions were introduced in response to the defendants' motion to dismiss, that motion was effectively converted into a motion for summary judgment. *See* Super. Ct. Civ. R. 12(b)(6); *Doolin v. Envtl. Power, Ltd.*, 360 A.2d 493, 496, n. 5 (D.C.1976).

28. The record must be so viewed where, as here, the motion before the court is effectively one for summary judgment. *See, e.g., Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc).

29. The doctrine of *res judicata* applies only where a claim has been finally adjudicated. *Stutsman, supra*, 546 A.2d at 369. In this case, in light of our partial reversal of the order dismissing Ms. Wallace's first action, there is no final judgment in that case. We have, however, affirmed the dismissal of the plaintiff's wrongful discharge claim. In light of our disposition of the second appeal on other grounds, we need not decide whether after the partial reversal, the requisite finality still exists for the application of claim preclusion principles to any of the plaintiff's claims.

servants, engaged in work in and about the employer's household; *any person acting in the interest of such employer, directly or indirectly;* and any professional association.

D.C.Code § 1–2502(10) (1992) (emphasis added). The Act also makes it an unlawful discriminatory practice for any person to "aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so." D.C.Code § 1–2526 (1992).

▮▮▮▮ The partner defendants contend that the plaintiff was employed for compensation by Skadden, Arps, and not by the individual partners, and that therefore none of the partners is the plaintiff's employer. This argument has some force with respect to the first part of the statutory definition of "employer," but it cannot be reconciled with the phrase which we have italicized in that definition. According the italicized words their normal everyday meaning, *see James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45–46 (D.C. 1989), we conclude that the partners fall within the ambit of the statute. Where, as here, the employer is a law partnership, the phrase "any person acting in the interest of such employer, directly or indirectly," necessarily includes a partner.[30] Indeed, if the quoted language italicized in Section 1–2502(10) does not extend to a partner in a law firm, it is difficult to conceive of any person to whom it would apply.

▮▮▮ Moreover, if Skadden, Arps unlawfully discriminated against the plaintiff as alleged, then the partners who carried out the allegedly discriminatory acts aided and abetted the employer's discrimination, in violation of Section 1–2526. An aider or abettor is one who "in some sort associate[s] himself with the venture, ... participate[s] in it as something he wishe[s] to bring about, [and] seek[s] by his action to make it succeed." *Roy v. United States,* 652 A.2d 1098, 1104 (D.C.1995) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (Learned Hand, J.)). Even if we were to assume that the individual partners are not employers, and thus not principals in the alleged discrimination, the complaint fairly alleges that these defendants participated in the discrimination and sought to make it succeed. In *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542 (3d Cir.1996), the court held that if, as there alleged, the plaintiff's supervisor knew or should have known that the plaintiff was being sexually harassed, and if he repeatedly refused to take prompt action to end the harassment, then "[s]uch conduct, if proven, would constitute aiding and abetting," in violation of Pennsylvania's counterpart to Section 1–2526. *Id.* at 553. In the present case, the individual partners are alleged to have personally engaged in discriminatory conduct, and not simply to have failed to prevent it. The reasoning of *Dici* therefore applies *a fortiori.* Moreover, the presence in the Human Rights Act of the proscription against aiding and abetting refutes the partner-defendants' contention that the Act "imposes liability only on the employing entity."

In urging affirmance of the trial judge's decision, the partner defendants rely principally on federal precedents construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[31] Under Title VII, the defendants' position would arguably be correct. "[T]he clear majority of the courts of appeals that have considered this question have held

---

30. We recognize that, for purposes of determining whether a partnership is vicariously liable for a partner's conduct, a partner acting out of discriminatory animus may not in fact be actuated by a purpose to serve the partnership. *Cf. Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 2266, 141 L.Ed.2d 633 (1998). As used in Section 1–2502(10), however, the phrase "person acting in the interest of the employer" defines "employer" and obviously refers to the person's *duties* and not to his or her motivations. According to the plain language of the statute, any person "acting in the interest of [the] employer, directly or indirectly," is not permitted to discriminate on account of race, marital status or any other prohibited ground.

31. "In interpreting [the Human Rights Act] we have generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance and have adopted those precedents when appropriate." *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C.1994) (citation omitted).

that individual employees cannot be held liable under Title VII." *Sheridan v. E.I. Du-Pont de Nemours & Co.*, 100 F.3d 1061, 1077–78 (3d Cir.1996) (collecting authorities), *cert. denied,* —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). Moreover, some courts have held that a partner in a law firm is not personally liable under the federal statute. *See, e.g., Yaba v. Cadwalader, Wickersham & Taft*, 896 F.Supp. 352, 353 (S.D.N.Y.1995) (citations omitted); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 882 F.Supp. 1529, 1532 (E.D.Pa.1995).

We note, however, that Title VII differs from the Human Rights Act in several critical respects. First, Title VII's definition of "employer," 42 U.S.C. § 2000e (b), does not contain the phrase "any person acting in the interest of such employer, directly or indirectly." [32] Second, there is no provision in Title VII proscribing "aiding or abetting." The language of the Human Rights Act on which we have relied in support of our conclusion that the partner defendants are amenable to suit thus finds no analogue in the federal statute.

Moreover, Title VII does not apply to employers with fewer than fifteen employees. 42 U.S.C. § 2000e (b). As one court explained in holding that the managing partner of a law firm cannot be held personally liable under Title VII, "Congress would not have exempted employers with up to 25 [later 15] employees from liability, but kept an individual open to personal liability." *Caplan, supra*, 882 F.Supp. at 1532. The logic that the court found "persuasive" in *Caplan* is not available to the partner defendants here, for the Human Rights Act contains no exception for small employers. On the contrary, if an employer who employs only a single individual is subject to the Act, it is unlikely that the Council intended to protect partners in a large law firm from individual liability.

■■■ Our Human Rights Act was designed "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit...." D.C.Code § 1–2501 (1992). "Civil rights statutes are remedial and must be generously construed." *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C.1991) (interpreting Human Rights Act). If we were to adopt the construction of the Act urged on us by the partner-defendants, then a plaintiff could secure no relief—not even an injunction prohibiting further discrimination in the future [33]— against an individual partner who has personally and willfully denied the plaintiff the equal employment opportunity which is the plaintiff's due under the Act. We do not believe that the Council contemplated such a result, and we therefore hold that the Skadden, Arps partners were properly joined as defendants.

### III.

### CONCLUSION

In No. 96–CV–34, the judgment of the trial court is affirmed in part and reversed in

---

**32.** An employer is defined in Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such a person* ...." 42 U.S.C. § 2000e (b) (emphasis added). Some federal appellate courts have held that the term "agent," like other parts of the act, should be liberally construed, and that "[u]nder this liberal construction, immediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing." *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir.1990) (citing authorities). Other courts, while finding the above construction of the term "agent" to be "facially plausible," have concluded that "the obvious purpose of this agent provision was to incorporate *respondeat superior* liability into the statute." *Gary v. Long*, 313 U.S.App. D.C. 403, 411, 59 F.3d 1391, 1399 (quoting *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir.1993), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995)).

Textually, we think the court in *Harvey* has the better of the argument; *respondeat superior* applies to Title VII even without resort to the inclusion of "any agent" in the statutory definition of "employer." *See, generally, Ellerth, supra* note 30. In any event, the reference in the Human Rights Act to a person "acting in the interest of such employer" makes no reference to vicarious liability and cannot reasonably be read as an inartful articulation of the doctrine of *respondeat superior.* On the contrary, Section 1–2502(10) must be construed, in accordance with its terms, as including within the term "employer" any person who acts on the employer's behalf.

**33.** *See* D.C.Code §§ 1–2556, –2553(a)(1) (1992).

part. In No. 96–CV–739, the judgment is reversed. Each case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*